UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| NICK HARLEY, derivatively on behalf of ZOOMINFO TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HENRY SCHUCK, MICHAEL GRAHAM O'BRIEN, KEITH ENRIGHT, ASHLEY EVANS, ROBERT KEITH GIGLIO, ALISON GLEESON, MARK MADER, DOMENIC J. MAIDA, KATIE BOEHM ROONEY, RANDALL WINN, and OWEN WURZBACHER,<br><br>Defendants,<br><br>and<br><br>ZOOMINFO TECHNOLOGIES, INC.,<br><br>Nominal Defendant. | No.: 3:26-cv-05941<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nick Harley ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant ZoomInfo Technologies, Inc. ("ZoomInfo" or the "Company") files this Verified Shareholder Derivative Complaint against defendants Henry Schuck ("Schuck"), Michael Graham O'Brien ("O'Brien"), Keith Enright ("Enright"), Ashley Evans ("Evans"), Robert Keith Giglio ("Giglio"), Alison Gleeson ("Gleeson"), Mark Mader ("Mader"), Domenic J. Maida ("Maida"), Katie Boehm Rooney ("Rooney"), Randall Winn ("Winn"), and Owen Wurzbacher ("Wurzbacher") (collectively, the "Individual Defendants", and together with ZoomInfo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of ZoomInfo, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Schuck and O'Brien for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ZoomInfo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and officers of ZoomInfo from November 3, 2025 to May 11, 2026, both dates inclusive (the "Relevant Period").

2. ZoomInfo is a Delaware corporation headquartered in Vancouver, Washington principally engaged in the fields of software and data usage. The Company maintains a cloud-based operating system which its customers can utilize to gather and analyze various forms of data and other information, also referred to as "go-to-market" intelligence.

3. ZoomInfo's products are offered in the business-to-business market as opposed to being sold directly to consumers. The Company's customer base encompasses numerous industries at all levels of scale, including but not limited to software, business services, and financial services.

4. The Company's platform is comprised of three major components: (1) the intelligence layer; (2) the orchestration layer; and (3) the engagement layer. The Company generates revenue by selling access to its platform to new and existing customers through a subscription-based model. ZoomInfo's operations involve extensive use of artificial intelligence ("AI") and machine learning to collate and utilize its various sources of data.

5. Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to its growth prospects and emerging negative market trends. For example, during an earnings call held on November 3, 2025 discussing the Company's third quarter results for 2025 (the "Q3 2025 Earnings Call"), Defendant Schuck touted the Company's central role in the expansion of AI amongst its customer base. Specifically, Defendant Schuck stated, in relevant part:



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***I think when we think about what's happening in the world with AI, and the AI transformations that are happening at companies across our customer base, we're getting more and more confident that those transformations can't be successful without a valid data foundation[.]***
>
> ***
>
> ***And so we feel really good about the fact that as those transformations continue here, that we're going to be a necessary component to any go-to-market AI transformation across our customer base and across the universe of prospects that we sell to.***[1]

6. The truth emerged on May 11, 2026, after the market closed, when the Company issued a press release to announce its financial results for the first quarter of 2026 (the "Q1 2026 Press Release"). The Q1 2026 Press Release disclosed that the Company was reducing its revenue guidance, stating, in relevant part:

> **Business Outlook:**
>
> Based on information available as of May 11, 2026, ZoomInfo is providing guidance for the second quarter and full year 2026 as follows:

| | **Q2 2026** | **Prior FY 2026** | **FY 2026** |
|---|---|---|---|
| GAAP Revenue | $300 - $303M | $1.247 - $1.267B | $1.185 - $1.205B |

7. Also on May 11, 2026, the Company hosted an earnings call to discuss its financial results for the first quarter of 2026 with investors and analysts (the "Q1 2026 Earnings Call"). During the Q1 2026 Earnings Call, Defendant Schuck reported that the Company was reducing its workforce by 20% and expected to experience roughly $45 million to $60 million in restructuring costs. During the Q1 2026 Earnings Call, Defendant Schuck stated: "***we are revising our full year***

---

[1] All emphasis has been added unless stated otherwise.



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

***guidance down in conjunction with significant cost reductions that we believe will position us with structurally higher operating margins and create a faster path back to durable growth***." Defendant Schuck further stated that "***[t]his was hard because of the impact on a large number of our teammates, many with long tenures here who did good work to get us to this point. Change is necessary and a positive decision for the future of ZoomInfo***."

8. On this news, the price of the Company's common stock fell $1.98, or roughly 32.8%, from a price per share of $6.04 at the close of trading on May 11, 2026 to close at $4.06 on May 12, 2026.

9. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the market for AI expansion was contracting; (2) demand for the Company's products by software companies was declining; (3) increasing numbers of the Company's customers were pursuing their own internal AI systems as opposed to purchasing outside AI products; (4) as a result of the foregoing, the Company would be unable to meet its 2026 full year revenue guidance; and (5) as a result of the foregoing, the Company would have to eliminate 20% of its workforce and sustain roughly $45 million to $60 million in restructuring costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing ZoomInfo to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed,



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

between November 2025 and April 2026, approximately 21.7 million shares of ZoomInfo common stock were repurchased, costing the Company approximately $160.2 million. As the Company's stock was actually worth only $4.06 per share, the price at which it was trading when markets closed on May 12, 2026, the Company overpaid for repurchases of its own stock by approximately $72.2 million in total.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to a federal securities fraud class action pending in the United States District Court for the Western District of Washington (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Schuck's and O'Brien's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Washington or who has minimum contacts with this District to justify the exercise of jurisdiction over them.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21. Plaintiff is a current shareholder of ZoomInfo. Plaintiff has continuously owned ZoomInfo common stock since first receiving the stock on June 3, 2021.

### Nominal Defendant ZoomInfo

22. ZoomInfo is a Delaware corporation with its principal executive offices at 330 W Columbia Way, Floor 8, Vancouver, Washington 98660. ZoomInfo's common stock trades on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "GTM."

### Defendant Schuck

23. Defendant Schuck co-founded the Company, and has served as the Company's CEO and as Chairman of the Board since November 2019.

24. The Schedule 14A the Company filed with the SEC on March 26, 2026 (the "2026 Proxy Statement") stated the following about Defendant Schuck, in relevant part:

> Mr. Schuck has served as Chief Executive Officer, Chairman of the Board and a director of ZoomInfo Technologies Inc. since its formation in November 2019 and served as Chief Executive Officer and a director of ZoomInfo Holdings LLC (formerly known as DiscoverOrg Holdings, LLC) since founding it in 2007. Prior to founding ZoomInfo Holdings LLC, Mr. Schuck was VP of Research & Marketing at iProfile, a sales intelligence firm focused on the IT market. Mr. Schuck is a cum laude graduate of the University of Nevada, Las Vegas with a



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> B.S. in Business Administration and a B.S. in Hospitality Management with Honors and holds a J.D., cum laude, from The Ohio State University Moritz College of Law. Mr. Schuck is a licensed attorney in Nevada and Washington. Mr. Schuck currently serves on the Board of Directors of YipitData, a market research and alternative data analytics firm, and Fetch, a mobile rewards application company. He served on the Board of Directors of Tegus, a financial data platform that was acquired by AlphaSense in 2024.

**<u>Defendant O'Brien</u>**

25. Defendant O'Brien has served as the Company's CFO since July 2025 and previously served as the Company's Interim CFO from September 2024 to July 2025. Defendant O'Brien has served at the Company since 2017 with increasing levels of responsibility, notably serving as Vice President of Financial Planning & Analysis from January 2023 to September 2024.

26. The 2026 Proxy Statement stated the following about Defendant O'Brien:

> Mr. O'Brien has served as our Chief Financial Officer since July 2025. He previously served as our Interim Chief Financial Officer from September 2024 to July 2025. He has also held roles with increasing levels of responsibility at ZoomInfo since December 2017, previously serving as Vice President of Financial Planning & Analysis from January 2023 to September 2024. Prior to joining the Company, Mr. O'Brien held accounting positions at Rainking Solutions from 2016 to 2017, and with Kaseya from 2008 to 2016. Mr. O'Brien holds a B.S. in Accounting from Lehigh University and is a CPA registered with the District of Columbia Board of Accountancy.

**<u>Defendant Enright</u>**

27. Defendant Enright has served as a Company director since March 2020. Defendant Enright currently serves as the Chair of the Privacy, Security and Technology Committee and as a member of the Audit Committee.

28. The 2026 Proxy Statement stated the following about Defendant Enright, in relevant part:



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> Mr. Enright has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since March 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from March 2020 to June 2020. Mr. Enright currently serves as a Partner at Gibson Dunn, a leading global law firm. Mr. Enright serves as Co-Chair of both the firm's Tech and Innovation Industry Group and Artificial Intelligence Practice Group. Prior to joining Gibson Dunn in September 2024, Mr. Enright was the Chief Privacy Officer of Google LLC, a multinational technology company that specializes in Internet-related services and products, which include online advertising technologies, a search engine, cloud computing, software, and hardware. Prior to joining Google in 2011, Mr. Enright was the Chief Privacy Officer and Vice President, Privacy of Macy's Inc. Mr. Enright holds a Bachelor of Arts Degree from the University of Massachusetts at Amherst and a Juris Doctor degree from The George Washington University Law School.

**<u>Defendant Evans</u>**

29. Defendant Evans has served as a Company director since February 2020. Defendant Evans currently serves as a member of the Audit Committee and as a member of the Compensation Committee.

30. The 2026 Proxy Statement stated the following about Defendant Evans, in relevant part:

> Ms. Evans has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from 2018 to June 2020. Ms. Evans currently serves as a Partner at Francisco Partners, a leading global investment firm that partners with technology businesses, which she joined in 2022. Prior to that, she was a Partner at The Carlyle Group, which she joined in 2006. She invests in enterprise software businesses and currently serves on the board of several privately held companies, including Greenslate, Macrobond and PayScale. She has previously served on the boards of HireVue, Jagex, Litmos, NEOGOV, Saama, SourceScrub, TriNetX and Veritas. She is a founder of SynGAP Research Fund, a public charity focused on improving the lives of SynGAP patients through the research and



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> development of precision treatments. Ms. Evans holds an A.B. summa cum laude from Harvard College, where she was elected to Phi Beta Kappa, an M.Phil from the University of Cambridge, where she was a Knox Scholar, and an M.B.A. from Stanford University's Graduate School of Business, where she was a Siebel Scholar and an Arjay Miller Scholar.

**Defendant Giglio**

31. Defendant Giglio has served as a Company director since March 2025. Defendant Giglio currently serves as a member of the Nominating and Corporate Governance Committee.

32. The 2026 Proxy Statement stated the following about Defendant Giglio, in relevant part:

> Mr. Giglio has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since March 2025. Mr. Giglio currently serves as the Chief Customer Officer at Canva, where he oversees Canva's sales and go-to-market efforts. Prior to his role at Canva, Mr. Giglio was the Chief Customer Officer at HubSpot from March 2022 to April 2024, where he led HubSpot's marketing, sales, success and operational efforts. Prior to that, Mr. Giglio led teams as the Chief Marketing Officer at DocuSign from March 2020 to March 2022, and held various senior leadership positions at Adobe from May 2009 to March 2020. Mr. Giglio holds an M.B.A. from the University of Southern California - Marshall School of Business and a B.A. from San Diego State University.

**Defendant Gleeson**

33. Defendant Gleeson has served as a Company director since July 2022. Defendant Gleeson currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

34. The 2026 Proxy Statement stated the following about Defendant Gleeson in relevant part:



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> Ms. Gleeson has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since July 2022. She currently also serves on the boards of directors of publicly traded SaaS companies Elastic N.V, since January 2020, and 8x8, Inc., since August 2021, and as a Special Advisor and Portfolio Committee Member at Brighton Park Capital, an investment firm, since October 2019. From January 1996 to October 2018, Ms. Gleeson was with Cisco, where she served in various roles, most recently as Senior Vice President, Americas from July 2014 to October 2018. In that role she was responsible for Cisco's largest geographic region, with $25B+ in annual sales, and led 9,000 employees across 35 countries. Ms. Gleeson is also a highly-regarded international speaker on the drivers for digital disruption across industries, the role of technology in enabling business transformation, and empowering women in technology. Ms. Gleeson holds a B.S. in Finance and Marketing from Michigan State University.

**<u>Defendant Mader</u>**

35. Defendant Mader has served as a Company director since February 2020. Defendant Mader also serves as a member of the Audit Committee.

36. The 2026 Proxy Statement stated the following about Defendant Mader, in relevant part:

> Mr. Mader has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from February 2020 to June 2020. Mr. Mader was President, Chief Executive Officer and a member of the Board of Directors of Smartsheet Inc., a SaaS collaboration and work management provider, from 2006 - September 2025. Prior to joining Smartsheet Inc., Mr. Mader served in various leadership positions from 1995 to 2005 at Onyx Software Corporation, a customer relationship management software company acquired by M2M Holdings, including as Senior Vice President of Global Services. He also was a Senior Associate at Greenwich Associates, a financial consulting firm from 1993 to 1995. Mr. Mader holds a B.A. in Geography from Dartmouth College.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

**Defendant Maida**

37. Defendant Maida has served as a Company director since August 2024. Defendant Maida currently serves as a member of the Privacy, Security, and Technology Committee.

38. The 2026 Proxy Statement stated the following about Defendant Maida, in relevant part:

> Mr. Maida has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since August 2024. Mr. Maida currently serves as Senior Advisor for Boston Consulting Group (BCG), an American global management consulting firm founded in 1963 and headquartered in Boston, Massachusetts, and is the founder of Maida Consulting which he founded in 2022, which provides strategic advisory services for information services and other data intensive industries. Prior to his current roles, Mr. Maida was Chief Data Officer from 2013 to 2021 at Bloomberg, where he was instrumental in revolutionizing global data operations through constant innovation. He currently serves as a director on the board of Macrobond Financial and Corporate Visions. Mr. Maida holds a B.S. in Mechanical Engineering from Johns Hopkins University.

**Defendant Rooney**

39. Defendant Rooney has served as a Company director since February 2025. Defendant Rooney currently serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

40. The 2026 Proxy Statement stated the following about Defendant Rooney, in relevant part:

> Ms. Rooney has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since February 2025. Ms. Rooney currently serves as the Chief Financial Officer of Maven Clinic, a healthcare company dedicated to women's and family health. Prior to her role at Maven Clinic, Ms. Rooney was the Global Chief Financial Officer and Chief Operating Officer at Alight, a leading cloud-based


THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> human capital technology and services provider. She has over two decades of leadership experience in financial and operational roles. Prior to Alight, she served in various leadership roles at Aon Hewitt from 2009 to 2017, including as Chief Financial Officer, and held various financial leadership positions at Morgan Stanley from 2006 to 2009. She previously served on the board of Smartsheet and currently serves on the board of trustees for Window to The World Communications, Inc., which owns WTTW and WFMT, Chicago's public broadcasting television and radio station. Ms. Rooney holds a Bachelor of Business Administration degree in finance from the University of Michigan.

**Defendant Winn**

41. Defendant Winn has served as a Company director since February 2020. Defendant Winn currently serves as a member of the Compensation Committee and as a member of the Privacy, Security and Technology Committee.

42. The 2026 Proxy Statement stated the following about Defendant Winn, in relevant part:

> Mr. Winn has served as a member of the board of directors of ZoomInfo Technologies Inc. since February 2020 and served as a member of the Board of Managers of ZoomInfo Holdings LLC from 2014 to June 2020. Mr. Winn currently serves as a Managing Member of 22C Capital, a minority "special forces" investment partner to both investors and management teams of B2B data analytics and information & business services companies, which he founded in 2017, and also serves as Managing Member of FiveW Capital. Mr. Winn is currently a director of the following private companies: RevSpring, LMI and Canoe Intelligence. Mr. Winn previously was the non-executive chairman of Dealogic, served on the board of Definitive Healthcare (NASDAQ:DH) and served on the boards of private companies such as Aurora Energy Research, Viteos Fund Services, Merit Software, and eMarketer. Mr. Winn also serves on the board of Sapien Labs, a non-profit advancing global research on mental wellbeing. Prior to founding 22C Capital, Mr. Winn was a co-founder of, and Co-Managing Partner and ultimately Executive Managing Director/CEO of Capital IQ from 1999 to 2011. Mr. Winn holds an A.B. from the Woodrow Wilson



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

School of Public and International Affairs at Princeton University.

**Defendant Wurzbacher**

43. Defendant Wurzbacher has served as a Company director since August 2024, and as the Company's Lead Independent Director since February 2026. Defendant Wurzbacher currently serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

44. The 2026 Proxy Statement stated the following about Defendant Wurzbacher, in relevant part:

> Mr. Wurzbacher has served as a member of the Board of Directors of ZoomInfo Technologies Inc. since August 2024, and as Lead Independent Director of the Board since February 2026. Mr. Wurzbacher currently serves as Chief Investment Officer at HighSage Ventures, where he sets the firm's strategy and oversees portfolio management. He was previously Managing Director & Portfolio Manager of HighSage Ventures from 2019 to 2023. Prior to his roles at HighSage Ventures, Mr. Wurzbacher worked at Highfields Capital, Amazon, and the Blackstone Group. Mr. Wurzbacher holds an M.B.A. from Stanford University's Graduate School of Business, where he was an Arjay Miller Scholar and the winner of the Alexander A. Robichek Award for Outstanding Achievement in Finance and an M.A. in Education. He graduated magna cum laude from Harvard University, receiving an A.B. in Biology with a minor in Economics.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

45. By reason of their positions as officers and directors and/or fiduciaries of ZoomInfo and because of their ability to control the business and corporate affairs of ZoomInfo, the Individual Defendants owed ZoomInfo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ZoomInfo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

act in furtherance of the best interests of ZoomInfo and its shareholders so as to benefit all shareholders equally.

46. Each director and officer of the Company owes to ZoomInfo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47. The Individual Defendants, because of their positions of control and authority as directors and/or officers of ZoomInfo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48. To discharge their duties, the officers and directors of ZoomInfo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ZoomInfo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

50. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

51. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ZoomInfo were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Washington, and the United States, and pursuant to ZoomInfo's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how ZoomInfo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

reports of the business and internal affairs of ZoomInfo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ZoomInfo's operations would comply with all applicable laws and ZoomInfo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52. Each of the Individual Defendants further owed to ZoomInfo and the shareholders the duty of loyalty requiring that each favor ZoomInfo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

53. At all times relevant hereto, the Individual Defendants were the agents of each other and of ZoomInfo and were at all times acting within the course and scope of such agency.

54. Because of their advisory, executive, managerial, directorial, and



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

controlling shareholder positions with ZoomInfo, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

55. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ZoomInfo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

58. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

the Board, each of the Individual Defendants who is or was a director of ZoomInfo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

60. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ZoomInfo and was at all times acting within the course and scope of such agency.

## ZOOMINFO'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *ZoomInfo's Code of Business Conduct and Ethics*

61. ZoomInfo's Code of Business Conduct and Ethics (the "Code of Conduct") states that "[i]ntegrity, honesty and sound judgment are fundamental to the reputation and success of" the Company and that the Code is:

> [D]esigned to ensure that ***all directors, officers (including the principal executive officer, principal financial officer, principal accounting officer, controller and persons performing similar functions) and employees of the Company*** (collectively, "Covered Parties") not only conduct themselves lawfully at all times, but also maintain the highest ethical standards in every aspect of their business dealings and seek to avoid even the appearance of improper behavior.

62. Under the heading "Conflicts of Interest," the Code of Conduct states, in relevant part:



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> It is the Company's policy that all Covered Parties avoid any conflict between their personal interests and those of the Company. The purpose of this policy is to ensure that the Company's honesty and integrity, and therefore its reputation, are not compromised. The fundamental principle guiding this policy is that no Covered Party should have, or appear to have, personal interests or relationships that actually or potentially conflict with the best interests of the Company. In the case of the Company's non-employee directors, compliance with this Code is subject to provisions of the Company's certificate of incorporation, bylaws and any stockholders agreement with the Company.

63. Under the heading "Confidential Information," the Code of Conduct states:

> In the course of their participation in the work of the Company, a Covered Party may obtain or have access to non-public information that might be of use to competitors, or harmful to the Company or the other source of such information, if disclosed. Such information may have been or may be provided in written or electronic form or orally. All such information, from whatever source obtained and regardless of the Company's connection to the information, is referred to herein as "Confidential Information."
>
> The Company is strongly committed to protecting Confidential Information, whether generated within the Company or obtained from some other source. The Company is also strongly committed to avoiding the misuse, or the appearance of misuse, of such information, whether in connection with the trading of securities or otherwise.
>
> Covered Parties must maintain the confidentiality of Confidential Information, except when disclosure is either expressly authorized by the Company or required by law.
>
> Notwithstanding the foregoing, and notwithstanding any other confidentiality or non-disclosure agreement {whether in writing or otherwise, including without limitation as part of an employment agreement, separation agreement or similar employment or compensation arrangement) applicable to current or former employees, this Code does not restrict any current or former employee from communicating, cooperating or filing a complaint with any U.S.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> federal, state or local governmental or law enforcement branch, agency or entity {collectively, a "Governmental Entity") with respect to possible violations of any U.S. federal, state or local law or regulation, or otherwise making disclosures to any Governmental Entity, in each case, that are protected under the whistleblower provisions of any such law or regulation, provided that {i) in each case such communications and disclosures are consistent with applicable law and {ii) the information subject to such disclosure was not obtained by the current or former employee through a communication that was subject to the attorney-client privilege, unless such disclosure of that information would otherwise be permitted by an attorney pursuant to 17 CFR 205.3{d){2), applicable state attorney conduct rules, or otherwise. Any agreement in conflict with the foregoing is hereby deemed amended by the Company to be consistent with the foregoing.

64. Under the heading "Compliance with Laws, Rules and Regulations," the Code of Conduct states that:

> Obeying the law, both in letter and in spirit, is one of the foundations on which the Company's ethical standards are built. In conducting the business of the Company, Covered Parties must respect and obey the laws of the jurisdictions in which we operate. Although not all Covered Parties are expected to know the details of these laws, it is important to know enough about the applicable local, state and national laws to determine when to seek advice from the Company's General Counsel or other appropriate personnel. If a law conflicts with any Company policy or this Code, you must comply with the law. There are serious consequences for failing to follow any applicable laws, rules and regulations, including termination of service and potential criminal and civil penalties.

65. Under the heading "Inappropriate Trading," in the subsection "Prohibition Against Insider Trading," the Code of Conduct states that:

> The federal securities laws prohibit any person who is in possession of material, non-public information from engaging in securities transactions on the basis of such information and from communicating such information to any other person for such use. Transacting in securities of the Company, or any other company, while you possess



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> material, nonpublic information is known as "insider trading." "Tipping," which is also prohibited, means communicating such material, nonpublic information to another for their or its use. Any of these actions may amount to "insider trading" and are strictly prohibited.

66. Under the heading "Accuracy of Records," the Code of Conduct states that:

> It is the Company's policy to make full, fair, accurate, timely and understandable disclosures in compliance with applicable laws and regulations in all reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission, state agencies, and in all other public communications made by the Company.
>
> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to the Company's continued and future business success. In addition, as a company whose stock is publicly traded, the Company is subject to a number of laws and regulations that govern our business records, including U.S. securities laws. The Company must record its financial activities in compliance with all applicable laws and accounting practices and provide current, complete and accurate information to any and all government agencies. No Covered Party may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no Covered Party may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, Covered Parties who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

67. Under the heading "Waivers of the Code," the Code of Conduct states that:

> Any waiver of any provision of this Code for executive officers or directors of the Company must be approved by the Board of Directors or a committee of the Board of Directors of the Company and will be



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> promptly disclosed as required by applicable securities law and/or stock exchange rules.

***ZoomInfo's Corporate Governance Guidelines***

68. ZoomInfo also maintains Corporate Governance Guidelines (the "Governance Guidelines") to "describe the principles and practices that the Board is expected to follow in carrying out its responsibilities."

69. The Governance Guidelines state that the "Role and Responsibility of the Board" are:

> The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company and its stockholders. The Board's responsibility is one of oversight, and in performing its oversight role, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved for the Company's stockholders. The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.
>
> The Board exercises direct oversight of strategic risks to the Company, including information technology security risks. The Audit Committee reviews guidelines and policies governing the process by which senior management assesses and manages the Company's exposure to risk, including the Company's major financial and operational risk exposures and the steps management takes to monitor and control such exposures. The Compensation Committee oversees risks relating to the Company's compensation policies and practices. The Nominating and Corporate Governance Committee assists the Board by overseeing and evaluating programs and risks associated with Board organization, membership, and structure and corporate governance. Each committee charged with risk oversight reports to the Board on those matters.

70. In violation of the Code of Conduct and Governance Guidelines, the Individual Defendants (as key officers and members of the Company's Board) caused the Company to issue materially false and misleading statements to the public, facilitated and disguised the Individual Defendant's violations of law,



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations and conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

***ZoomInfo's Audit Committee Charter***

71. The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

> A. Provide assistance to the Board of Directors (the "Board of Directors") of ZoomInfo Technologies Inc. (the "Company") with respect to its oversight of:
>
> i. The quality and integrity of the Company's financial statements, including oversight of the Company's accounting and financial reporting processes and financial statement audits;
>
> ii. The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;
>
> iii. The independent registered public accounting firm's qualifications, performance and independence;
>
> iv. The performance of the Company's internal audit function;
>
> v. Risk assessment and management, particularly with respect to financial risk exposure; and
>
> vi. The Company's environmental, social, and governance ("ESG") related strategy, policies, practices, risk assessment and management, and public disclosures.
>
> B. Prepare the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

72. Under a heading titled "Responsibilities and Duties," the Audit Committee Charter states, in relevant part:

> The following functions are expected to be the common recurring activities of the Committee in carrying out its responsibilities. These functions should serve as a guide with the understanding that the Committee may carry out additional functions and adopt additional policies and procedures as may be required or appropriate in light of changing business, legislative, regulatory, legal, or other conditions. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board of Directors from time to time.
>
> The Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard, the Committee shall have the authority, in its sole discretion, to engage and terminate independent counsel and other advisors, as it determines necessary or appropriate to carry out its duties. The Committee may also utilize the services of the Company's regular internal and/or external counsel or other advisors to the Company. The Company shall provide appropriate funding, as determined by the Committee, for payment of compensation to the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and any advisors that the Committee chooses to engage, as well as funding for the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

73. Under the same heading, in a subsection titled "Documents/Reports Review," the Audit Committee Charter states:

> 1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

2. Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time, including any critical audit matters.

3. Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (e.g., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

5. Review and discuss with the independent registered public accounting firm a draft of the auditor's report.

74. Under the same heading, in a subsection titled "Independent Registered Public Accounting Firm," the Audit Committee Charter states, *inter alia*:

6. Be solely and directly responsible for the appointment, compensation, retention, oversight and, when necessary, termination of any independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (including the resolution of disagreements between management and such firm regarding financial reporting).

7. Inform each independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company that such firm



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

must report directly to the Committee.

8. Pre-approve all auditing services and non-audit services (other than "prohibited non-audit services") to be provided to the Company by its independent registered public accounting firm. The Committee may delegate authority to one or more independent members to grant pre-approvals of audit and permitted non-audit services; provided that any such preapprovals shall be presented to the full Committee at its next scheduled meeting.

Notwithstanding the foregoing, pre-approval is not necessary for minor non-audit services if: (i) the aggregate amount of all such non-audit services provided to the Company constitutes not more than five percent of the total amount of revenues paid by the Company to its independent registered public accounting firm during the fiscal year in which the non-audit services are provided; (ii) such services were not recognized by the Company at the time of the engagement to be non-audit services; and (iii) such services are promptly brought to the attention of the Committee and approved prior to the completion of the audit by the Committee or by one or more members of the Committee who are members of the Board of Directors to whom authority to grant such approvals has been delegated by the Committee.

The following shall be "prohibited non-audit services": (i) bookkeeping or other services related to the accounting records or financial statements of the Company; (ii) financial information systems design and implementation; (iii) appraisal or valuation services, providing fairness opinions or preparing contribution-in-kind reports; (iv) actuarial services; (v) internal audit outsourcing services; (vi) management functions or human resources; (vii) broker or dealer, investment adviser or investment banking services; (viii) legal services and expert services unrelated to the audit; and (ix) any other service that the Public Company Accounting Oversight Board prohibits through regulation.

75. Under the same heading, in a subsection titled "Accounting and Financial Reporting Process," the Audit Committee Charter states:

12. In consultation with the independent registered public accounting



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's financial reporting processes. In that regard, the Committee must obtain, review and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

● all critical accounting policies and practices to be used by the Company;

● analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements and the treatment preferred by the independent registered public accounting firm;

● major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

● major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and

● any other material written communications between the independent registered public accounting firm and the Company's management, such as any management letter or schedule of unadjusted differences.

13. Review periodically the effect of regulatory and accounting initiatives, as well as offbalance sheet structures (if any), on the financial statements of the Company.

14. Review with the independent registered public accounting firm (i)



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> any problems or difficulties encountered by such firm in the course of the review or audit work, including any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and such firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company

76. Under the same heading, in a subsection titled "Internal Audit," the Audit Committee Charter states:

> 15. Oversee the Company's internal audit function, which may be outsourced to a third-party service provider.
>
> 16. Review the significant reports to management prepared by the internal auditors (or other personnel or service providers responsible for the internal audit function) and management's responses.
>
> 17. Review and discuss with management, and if appropriate, the independent registered public accounting firm and/or any service provider providing internal audit services to the Company, the responsibilities, budget and staffing of the Company's internal audit function.

77. Under the same heading, in a subsection titled "Legal Compliance/General," the Audit Committee Charter states:

> 18. Periodically review and discuss with the Company's General Counsel, or their designee, any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.
>
> 19. Review and discuss with management and the independent



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

20. Set clear policies for the Company's hiring of partners or employees or former partners or former employees of the independent registered public accounting firm. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Company if the chief executive officer, controller, chief financial officer, chief accounting officer or any person serving in an equivalent capacity for the Company was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Company during the one-year period preceding the date of the initiation of the audit.

21. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

22. Oversee, review and periodically update the Company's Code of Business Conduct and Ethics (the "Code") (including review of requests of waivers thereof by executive officers and directors) and the Company's system to monitor compliance with and enforce the Code.

23. Unless otherwise approved or ratified pursuant to the Board's "Related Person Transaction Policy," the Committee shall review and approve or ratify all transactions between the Company and any Related Person that are required to be disclosed pursuant to Item 404(a) of Regulation S-K ("Item 404(a)"). "Related Person" shall have the meaning given to such term in Item 404(a), as amended from time to time. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

24. Review and approve at least on an annual basis the decisions by



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> management to enter into derivative transactions on a cleared or non-cleared basis, and the policies and processes of the Company related thereto, and review and recommend to the Board of Directors on matters pertaining to the Company's derivative transactions and hedging strategy.

78. In violation of the Audit Committee Charter, the Individual Defendants sitting on the Audit Committee (as key officers and members of the Company's Board) caused the Company to issue materially false and misleading statements to the public, facilitated and disguised the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Audit Committee Charter, the Individual Defendants failed to implement risk assessment and risk management protocol and failed to ensure the Company's compliance with applicable law.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79. ZoomInfo is principally engaged in the fields of software and data usage. The Company's business model centers around the accumulation and analysis of customer data for various purposes. As such, ZoomInfo operates a cloud-based operating platform which the Company sells access to. Access to the Company's data platform functions on a subscription basis, allowing ZoomInfo to generate revenue from both new and existing customers. According to the Company, its subscription prices are determined according to the users, functionality, and records under management included in the product.

80. The Company platform consists of three main components: (1) the intelligence layer; (2) the orchestration layer; and (3) the engagement layer.

81. The intelligence layer consists of the Company's accumulated data which its customers can access for insights. ZoomInfo gathers information through



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

first- and third-party sources. The orchestration layer compiles related data, leads, and analyses and directs such data sources to the appropriate customers. The engagement layer encompasses the Company's sales, marketing, operations, and recruiting professionals.

82. The Company's sales professionals utilize its data amalgamation and analyses to provide coaching and sales engagement services for customers. Likewise, the Company's marketing and operations professionals use the data collected by ZoomInfo to streamline its customers' advertising and marketing efforts. In addition, the Company's recruiting professionals utilize the Company's data collection to optimize the hiring process of its customer base.

83. ZoomInfo's data collection and analysis procedures purportedly provide high-quality intelligence in large part using AI and machine learning. The Company's AI aggregates various forms of data such as keywords, locations, contact information, and revenue, and makes calculations and determinations based off such information. The Company's customer base covers all sizes of companies and spans various industries including financial services, media and internet, real estate, manufacturing, and software.

**<u>False and Misleading Statements</u>**

***November 3, 2025 Press Release and Earnings Call***

84. On November 3, 2025, the Company issued a press release to announce its financial results for the third quarter of 2025 (the "Q3 2025 Press Release"). The Q3 2025 Press Release noted that the Company was raising its full year 2025 revenue guidance, stating the following, in relevant part:

> **Third Quarter 2025 Financial Highlights:**
> • GAAP Revenue of $318.0 million, an increase of 5% year-over-year.



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> • GAAP Operating income of $67.5 million and Adjusted operating income of $117.7 million.
> • GAAP Operating income margin of 21% and Adjusted operating income margin of 37%.
> • GAAP Cash flow from operations of $93.8 million and Unlevered free cash flow of $95.3 million.

***

**Business Outlook:**

Based on information available as of November 3, 2025, ZoomInfo is providing guidance for the fourth quarter and full year 2025 as follows:

| | **Q4 2025** | **Prior FY 2025** | **FY 2025** |
|---|---|---|---|
| GAAP Revenue | $307 - $310M | $1.125 - $1.225B | $1.237 - $1.24B |

85. The Q3 2025 Press Release also quoted Defendant Schuck as stating the following:

> We delivered strong Q3 results with record revenue, accelerating Upmarket momentum, and improving net revenue retention, validating our strategic focus and the value we deliver to customers . . . We're building the future of go-to-market – connecting intelligence, automation, and execution in one system for go-to-market teams and the AI agents serving them.

86. That same day, the Company hosted the Q3 2025 Earnings Call. On the Q3 2020 Earnings Call, Defendant Schuck highlighted the Company's growth prospects, stating:

> During the quarter, we accelerated upmarket growth, improved net revenue retention for the fifth straight quarter, delivered another quarter of strong profitability and are again raising our financial guidance for the year. ***We are aggressively expanding the product portfolio with innovative go-to-market AI and workflow products as we continue***



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***our shift upmarket. I believe we are building and delivering the best solutions that we've ever put in front of customers, which is driving stronger daily engagement from a diverse set of go-to-market personas.***
>
> Our operations suite again grew more than 20% year-over-year as our proprietary data asset continues to prove mission-critical to any AI-driven initiative that touches go-to-market. This is our fastest-growing product, and it's accelerating as it gets bigger. ***And with the launch of Copilot last year, its expansion into GTM Workspace this quarter and the evolution of our GTM Studio platform, we've begun to play offense again. Through the innovation we are driving, I believe it is only a matter of time before ZoomInfo will be synonymous with AI and go-to-market.***
>
> ***We believe that our unique and proprietary data assets put us in the winners column as AI proliferates across go-to-market teams.***
>
> * * *
>
> We are increasingly confident in the trajectory of the business, which gives us even more conviction that our ongoing share repurchases will drive substantial shareholder value, and we will continue to put the majority of the cash we generate into repurchasing ZoomInfo shares for as long as that is the best and highest return use of our free cash flow. ***AI is giving us an opportunity to capitalize on our proprietary data assets***.

87. Also during the Q3 2025 Earnings Call, Defendant O'Brien discussed the Company's improvements in AI product implementation, customer retention, and Company growth, stating the following, in relevant part:

> ***Net revenue retention improved to 90% in the quarter, up 5 percentage points in the year and the highest level of NRR we have seen since Q2 2023. In-period net revenue retention for upmarket customers is again over 100% as we further entrench ZoomInfo as a mission-critical piece of the way scaled businesses go to market.*** We have always operated efficiently with disciplined investments driving high levels of profitability, and I am pleased to report a 37% adjusted



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> operating income margin in the quarter, delivering year-over-year margin improvement, which, combined with our revenue growth, returned us to a Rule of 40 company for the first time in 6 quarters.
>
> ***
>
> Shifting to guidance. For Q4, we expect GAAP revenue in the range of $307 million to $310 million, adjusted operating income in the range of $117 million to $120 million and non-GAAP net income in the range of $0.27 to $0.29 per share. ***We are again raising guidance for the full year. And for 2025, we now expect GAAP revenue in the range of $1.237 billion to $1.240 billion, representing positive 2% annual revenue growth for the year at the midpoint of guidance and adjusted operating income in the range of $440 million to $443 million, representing a 36% margin at the midpoint of guidance.*** We expect non-GAAP net income in the range of $1.04 to $1.06 per share based on 341 million weighted average diluted shares outstanding, and we expect unlevered free cash flow in the range of $424 million to $444 million.

88. Later in the call, during the question-and-answer portion, Defendant Schuck' responded to the questions from an analyst concerning the Company's performance during the third quarter of 2025 in the following relevant exchange:

> [Q: Mark Ronald Murphy – JPMorgan Chase & Co. – Managing Director & Head of U.S. Enterprise Software Research] The magnitude of revenue upside is just noticeably larger for Q3 than it has been in the recent past. I think we're seeing the same on RPO. I'm wondering if you can drill down into what you think might have fueled that extra strength there in the quarter.
>
> [A: Defendant 'Schuck] ***Look, by every metric, Q3 was a really strong quarter. We executed well across the business. I'd say that the products that we're delivering are delivering better renewal outcomes. That mid-to-high single-digit uplift on initial renewal from Copilot is certainly above or above our internal expectation and that's contributing to revenue upside in the quarter.*** We talked about the



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

largest TCV deal in history that we closed early in Q3. That contributed to revenue upside.

89. Also during the Q3 2025 Earnings Call, Defendant O'Brien responded to an analyst's question concerning upmarket retention in the following pertinent exchange:

> [Q: Sitikantha Panigrahi – Mizuho Securities – Managing Director] Graham, could you talk about upmarket retention? How has that been trending? And especially when you're seeing this -- the NRR growth, how much of that driven by seat count versus cross-selling of your different other modules?
>
> [A: Defendant O'Brien] ***The upmarket net retention was again above 100% in period in Q3. So we're definitely getting improving retention in that upmarket business as the mix becomes a greater part of the business. So we kind of get a compounding effect. It's coming from a lot of different places. We started building products a couple of years ago that were aimed at optimizing retention outcomes, and we're starting to benefit from that as these customers renew at much higher rates. We have upsell opportunity with Copilot now with GTM Workspace. We have upsell opportunity with go-to-market studio.***

90. During the Q3 2025 Earnings Call, Defendant Schuck responded to an analyst's question concerning the Company's growth prospects in the following pertinent exchange:

> [Q: Raimo Lenschow – Barclays Bank PLC – MD & Analyst] Can you talk a little bit about like it does sound like the world is getting out better there. Can you talk a little bit about more nuance in terms of geographies, verticals, et cetera, where you see like things getting really better versus kind of stable or still weak?
>
> [A: Defendant Schuck] ***I think when we think about what's happening in the world with AI, and the AI transformations that are happening at companies across our customer base, we're getting more and more confident that those transformations can't be successful without a***



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***valid data foundation, which we think of as context, context for the AI that's going to be deployed. And so we feel really good about the fact that as those transformations continue here, that we're going to be a necessary component to any go-to-market AI transformation across our customer base and across the universe of prospects that we sell to.***
>
> So we feel really good about that***. I think we saw improvement in downmarket retention sequentially as well, and we feel good about the new products driving better retention. And so I think there's just a lot in the positive column that gives us a lot of confidence in the business going forward.***

91. Also during the Q3 2025 Earnings Call, Defendant Schuck responded to an analyst's question concerning a particular customer sales process in the following pertinent exchange:

> [Q: Koji Ikeda – BofA Securities – Vice President] I wanted to ask about the private unified data and AI company mentioned in the prepared remarks, a nice win there and clearly shows that they couldn't do it themselves. And so maybe can you talk a little bit about how that sales process went? And was it a bunch of back and forth with many proof of concepts? Or was it a pretty typically easy and smooth sale for you guys with this company?
>
> [A: Defendant Schuck] Yeah. This was a customer who's actually been a customer of ZoomInfo for a number of years, and we've continued to grow that account through Merit across the organization. And as we continue -- as that company continues to move their business upmarket to target new personas and to bring on new salespeople, we're well positioned as we've already cleared security, data privacy review. ***We've built trust with our stakeholders there, we're uniquely positioned to continue to grow the account there, and we were and then executed against that. There's still a tremendous amount of opportunity within that account and across our enterprise clients.***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

92. Later during the Q3 2025 Earnings Call, Defendant Schuck responded to an analyst's question concerning the internal leveraging of the Company's AI in the following exchange:

> [Q: Clark Joseph Wright – D.A. Davidson & Co. – Senior Research Associate] The Operations suite continues to be a key growth driver. And Henry, you made the point that the proprietary data assets that ZoomInfo has enhances enterprise's AI initiatives. How are you investing in leveraging AI internally to maintain and improve this data advantage?
>
> [A: Defendant Schuck] Yeah. ***We are really proud of how we're using AI internally at ZoomInfo. We are customer-zero on all of the AI solutions that we're releasing to our customers. We have thousands of salespeople on these products before we release them to our customers. They're leaned in. It's driving efficiency and their ability to engage with customers in insightful ways. It helps them create decks, and QBR plans, and account plans and writes back to the CRM for them. It flags risk in their account base. So we feel really good about the way that we're leveraging AI across ZoomInfo.***
>
> ***I would venture to guess that we are in the top decile of companies leveraging AI to drive efficiency and not just in our Go-To-Market organization.*** Graham talked about ways that we're using it in our finance organization. ***We're leveraging AI across our product organization. We've been able to drive efficiencies and lower headcount because we're leveraging AI to generate content for us to drive our product marketing motion.***
>
> I think when we show other customers, our peer groups or our clients, the way that we use AI internally, they all walk away incredibly impressed by the way that we're leveraging it and wanting best practices, tear sheets that they can take back to their own organization. ***We're going to continue to invest in AI to drive meaningful efficiency in our business.***

***November 18, 2025 Wells Fargo 9th Annual TMT Summit***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

93. On November 18, 2025, Defendant O'Brien represented the Company at the Wells Fargo 9th Annual TMT Summit (the "2025 Wells Fargo Summit").

94. During the 2025 Wells Fargo Summit, Defendant O'Brien responded to an analyst's request for elaboration on the Company's upmarket momentum in the following pertinent exchange:

> [Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst] Yes, definitely a more solid quarter than investors were anticipating. We love to kind of unpack some of the components behind that. So -- maybe starting on like the upmarket momentum.
>
> [A: Defendant O'Brien] Our market business is growing. ***Like I said earlier, that's actually much more profitable than our downmarket business, so the kind of upside that we got top line in Q3, you could think of coming from improvements in that market net retention, where in period, our upmarket business, our customers had retention activity that was at 100% again for the second quarter in a row.***
>
> Our operations business, which is almost exclusively upmarket, Think of this as our data foundation it's still growing 20% year-over-year. It's now more than 15% of our total business. ***This is a product that is obviously, in AI beneficiary, as businesses of all sizes look to kind of start to marry their first-party data with our best-in-class B2B third-party data, so they can deliver effective GTM outcomes using AI.***
>
> [Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst] Actually, I want to double-click on that operations suite. So very strong growth in the quarter. For investors maybe who are new to the story, can you just kind of overview that product and how that makes sense in the generative AI world?
>
> [A: Defendant O'Brien] Yes. ***So operations is effectively our data suite for our core data asset, our proprietary data. So what we've -- basically, customers purchase that on a subscription basis. It's not a seat-based model. Think of it as like a data access subscription where they get access to a geo set of data or all 100 million companies that are in that data center, all 500 million business professionals.*** We also



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

layer signals and intent on top of that data asset. And then customers purchased it for a 1- or 2- or 3-year subscription. We enrich that data for them. We route it. We go on with them and we actually help them marry it with their first-party data to create this kind of live, always-on kind of data asset that then they can build application or agents on top of to have the context to go deliver those GTM outcomes that they're seeking to.

[Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst] And it seems like, especially for customers and businesses that are newer to AI, go-to-market enrichment or kind of operations suite seems like the first step for them. So what's like the customer reaction been so far? And then has that kind of like the switched on for them like, okay, now we need to do more here?

[A: Defendant O'Brien] ***Yes. I think the demand for AI for GTM is evident up and down our customer stack. Now there's like sophistication curves of whether it's how sophisticated are they from an AI and kind of AI usage on a day-to-day basis, how sophisticated are their data operations. And some big companies are less sophisticated. We have a lot of great opportunity to kind of show them the way as partners in that.***

And then you actually have some more smaller even AI native companies that are just starting to build go-to-market after kind of an R&D phase. and we're kind of the clear frontrunner to go in and help them build AI for GTM as they start to go to market.

[Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst] And just as you think about the components of your improving net retention, Copilot helps and improving retention rates on Copilot customers help, shift upmarket helps. So we've touched on some of the things and maybe a better macro environment for sales personnel hiring as well. But I guess like how would you disaggregate the pieces that have helped you there?

[A: Defendant O'Brien] Yes. I think the -- getting further away from the downsell pressure that we went through in 2022 and 2023 from -- mostly in our software vertical, a lot of that was seat compression. ***Operations is a big reason -- or a big contributor to our retention***



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

***improvement. The customers that buy our operations suite have very high operations retention. They tend to buy once and then buy a lot more, whether that's more data or more services around that data, getting -- shifting more and more customers off of legacy Sales OS on to Copilot, we talked about earlier, like there's a better -- there's a renewal tailwind from doing that.***

[Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst] And just on like what you've done internally with AI, like we're asking everybody today, like is there anything that you have one of the best sales forces I've ever seen…Just maybe on your own sales side, any AI efficiencies that you've seen and then maybe for the broader business as well.

[A: Defendant O'Brien] Yes. Look, I think we are our first and best customer of Copilot of GTM Workspace, go-to-market studio. I think we've been able to kind of rightsize our downmarket investment while reallocating some of that upmarket. A lot of that has come by leveraging our own products. ***And then even outside of sales and marketing, whether it's what you would expect kind of in R&D world in finance, there's been a lot of specific kind of AI use cases that we've built from a revenue accounting risk perspective. We use Copilot to do collections and accounts receivables, like a really valuable use case. So we've been leveraging our own products across our teams at ZoomInfo.***

[Q: Ryan Patrick MacWilliams – Wells Fargo Securities, LLC – Equity Analyst] [y]our conversations post the quarter with investors, what are those -- like they touched on anything that was interesting or you haven't thought of before? Or is there an area of focus that it seems like a pain point or just like investors are -- you're getting more questions than not now?

[A: Defendant O'Brien] Yes. I think conversations after we released earnings on the call were really positive. I think folks were pleasantly surprised by the upmarket acceleration. I think that was generally above and beyond expectations. It was good to see some improvement in down market. ***A lot of what our investors are kind of digging in on is like GTM Workspace, what the next evolution of Copilot looks like, the excitement around operations, like that's still growing 20% and***



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***it's accelerating and it's 15% of the business, what could the future of that business look like in 2 to 5 years. So it's generally positive exciting conversations.***

***December 3, 2025 UBS Global Technology and AI Conference***

95. On December 3, 2025, Defendant Schuck represented the Company at the UBS Global Technology and AI Conference (the "2025 UBS Conference").

96. During the 2025 UBS Conference, Defendant Schuck responded to an analyst's request for elaboration on the Company's demand trends and strategic evolution in the following pertinent exchange:

> [Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst] So maybe you could just talk through the current demand trends that you're seeing and also how ZoomInfo is strategically evolving its business and strengthening for future growth opportunities?
>
> [A: Defendant Schuck] ***And then the next thing we said was we see a really big opportunity with AI in go-to-market, and we were going to go aggressively after that opportunity***.
>
> In May of '24, we released our first product there, our Copilot product. And so we've just started coming around on sort of a full year of renewal on that Copilot product. ***What we're seeing is customers who use Copilot and leverage the AI functionalities there, renew and retain at mid- to high single digits better than our legacy sales product. So as customers are engaging with our new products, net retention rates are higher. We had rebuilt over that period of time, our product and engineering organizations***.
>
> [Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst] And the other two big products, that ZoomInfo has announced more recently are GTM Studio and GTM Workspace. I recognize these are still very early stage, but maybe you could just give some color on what initial customer feedback has been and any early signs of adoption.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

[A: Defendant Schuck] ***So look, I think that in the future, there is going to be a go-to-market AI platform. And when you look across -- you walk into a company, there's HR, there's engineering, there are people who build the product. And then on the other side, there are people who sell -- who sell the product -- and market and sell the product***.

* * *

But to do work in the AI era, you can't just rely on first-party data. ***And so we really believe that the big opportunity in front of us is a go-to-market AI platform where go-to-market practitioners, whether they be marketing or sales account managers or account executives do their work***.

In order to get that -- to deliver that, the first thing you need is context for the AI agent. You have to have first-party data from your systems of record married to third-party data that comes together in a really clean way and deliver the contextual engine that AI agents can be -- can build on top of. And so we've been very focused on building that. And then that sort of core layer is what powers Copilot, it's what powers GTM Studio. It's what powers GTM Workspace.

* * *

Everything we're building Copilot, Workspace, Studio. All of those solutions are AI native because we weren't trapped in this. What you would find in just about every other $1 billion SaaS business we weren't burdened with. ***And so all of the new solutions are AI first, the velocity with which we're releasing those products is incredibly fast, and we don't have to sort of like bend over backwards to build it around legacy architecture***.

[Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst] And let's go back to OperationsOS. That's been playing an important role for growth. It's consistently been growing 20% plus. So could you just talk about the demand trends that you see there? It sounds like there's potential AI tailwinds attached to that business. So what's the update?



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> [A: Defendant Schuck] ***The big opportunity we see in '26 is being able to use Studio as the -- use GTM Studio as the interface to sell operations to a much broader segment of our customers.***
>
> * * *
>
> And what Studio gives us the ability to do is actually show up with a software interface that says like, here's your total addressable market. You plug it into Snowflake here, you plug it into CRM here, you can bring that data in, you can merge it, you can match it, you could use AI. ***And so it opens up a much larger segment of the market for us to sell our fastest-growing product into.***

***December 9, 2025 53rd Annual Nasdaq Investor Conference***

97. On December 9, 2025, Defendant O'Brien represented the Company at the 53rd Annual Nasdaq Investor Conference (the "2025 Nasdaq Conference").

98. At the 2025 Nasdaq Conference, Defendant O'Brien responded to an analyst's question concerning the Company's go-to-market product in the following pertinent exchange:

> [Q: Christopher Quintero – Morgan Stanley – Equity Analyst] Another really interesting product, I think Henry has cited that Go-To-Market Studio is potentially one of the biggest products that ZoomInfo has ever released. So what does it exactly do? What are the kind of key workflows, processes that it really enables for customers here?
>
> [A: Defendant O'Brien] Yes. ***GTM Studio is our orchestration engine. It's going to be part of our Operations suite. So our Operations business is our -- essentially our DaaS or our data access subscription. It's not seat-based. It's our fastest-growing business. It's now over 15% of our total ACV. It's growing 20% plus year-over-year and accelerating. This is a place where we are truly an AI beneficiary.***
>
> [Q: Christopher Quintero – Morgan Stanley – Equity Analyst] Shifting gears a little bit to competition and the advent of AI. Maybe first on like the risk side. There's a lot of concerns from investors around the need



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

for fewer employees and maybe sales reps in your case.

[A: Defendant O'Brien] Yes, I don't think there's a maximum. I think that we have a lot of different options for positive outcomes across a spectrum of seat trends. ***Largely, when we -- in like kind of our customer base, we haven't seen this like, "Oh, seats are going way down quickly." Like we did see the compression in '21 and '22, but that wasn't AI related. So we've seen largely neutral trends, pockets of hiring. We talked about the -- some of the shift back into outbound SDR hiring. But we are still diversifying our pricing models because we think this is the right long-term thing to do.***

***Within our seat base, we have a lot -- or within our customer base, there is a massive opportunity of unused -- or I guess, unsold seats right now. So if we historically sold legacy SalesOS largely to a top-of-funnel SDR or BDR use case, there are account management and account executive teams that exist at our current upmarket customer base that we haven't historically sold to.*** And GTM Workspace and Copilot were built to sell to those. So even with no net hiring in our seat base, we have a huge seat penetration opportunity alone there.

[Q: Christopher Quintero – Morgan Stanley – Equity Analyst] What do you think is most underappreciated from investors about the ZoomInfo story? Where should they really be digging into?

[A: Defendant O'Brien] Yes. ***I think the -- overall, I think the economic fundamentals of the business are still very strong. We talk a lot about the free cash flow per share growth there. I do think from kind of a product or growth perspective, it's the Operations business. Like this is a place where we are clearly an AI beneficiary***. I still think we're very early in this story, and we've got a business that's more than 15% of our total ACV that is accelerating that 20% plus growth. It's not seat-based, and it's just like an incredibly healthy business that we're really about the future of.

***February 9, 2026 Press Release and Earnings Call***

99. On February 9, 2026, the Company issued a press release to announce its financial results for the fourth quarter and full-year 2025 financial results (the



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

"Q4 2025 Press Release"). The Q4 2025 Press Release reported that the Company's fiscal 2026 revenue guidance was "in the range of $1.247 billion to $1.267 billion, representing positive 1% annual growth for the year at the midpoint of guidance."

100. The Q4 2025 Press Release quoted Defendant Schuck as stating the following:

> In 2025 we delivered record revenue, expanded profitability, and increased free cash flow, while building the all-in-one AI platform for go-to-market teams," said Henry Schuck, ZoomInfo Founder and CEO. "In 2026, our focus is on bringing that platform to our customers at scale – putting our differentiated data, intelligence, workflow automations, and AI-powered insights directly into the hands of go-to-market teams and AI agents so they can more efficiently find, win, and grow customers.

101. Also on February 9, 2026, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full-year 2025 with investors and analysts (the "Q4 2025 Earnings Call").

102. During the Q4 2025 Earnings Call, Defendant Schuck discussed purported reasons for the Company's strong quarter, stating the following, in relevant part:

> Success in our operations business continues to be driven by demand for actionable, high-quality data, a key foundation to power AI use cases, and operations again grew more than 20% year-over-year in the quarter.
>
> * * *
>
> 2025 was a year of fast-paced innovation as we rebuilt our product and engineering motions to be AI first and leverage AI and LLMs to improve our data quality and build out the broader ZoomInfo platform.
>
> * * *



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***AI development tools have lowered the cost of building software, but they don''t erode our advantage at the data layer. They accelerate what we can build on top of it. We are more than a horizontal software company, and AI has been an accelerant, expanding the use cases we power and the workflows where ZoomInfo shows up.***

* * *

> ***Customers are using our data to power AI agents, build audiences programmatically and run end-to-end campaigns that didn't exist 2 years ago. Operations, our Data-as-a-Service platform grew more than 20% year-over-year as we invested in data quality alongside that growth, adding over 10 million contacts and expanding coverage across 6 European markets because our customers' AI agents and workflows are only as good as the data powering them.*** That expanding surface area is why we built GTM Studio, an orchestration layer where revenue operations teams unify CRM data, warehouse data and ZoomInfo intelligence in one workspace to build audiences enrich with AI agents and activate directly into downstream systems.

* * *

> ***We have not and will not optimize for any single quarter''s results, but rather for the multi-decade opportunity we see in front of us. We are now ready to go on the offense with these new products commercially available in 2026.***

* * *

> We have been presented with a generational opportunity to create value. While we can't control market forces, we do control our execution and our capital allocation. Our strong free cash flow generation and efficient operating model enable us to uniquely take advantage of the prevailing negativity. Equipped with our best products and our best leadership team ever, in 2026, we will rev our distribution engine and bring the go-to-market AI platform to all go-to-market professionals. ***We are confident in our path ahead and in our ability to sustainably deliver revenue growth and industry-leading profitability. We will continue to grow free cash flow per share while defining the future of go-to-***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***market with solutions that help our customers win in increasingly competitive markets.***

103. Later on during the Q4 2025 Earnings Call, Defendants Schuck 'responded to an analyst's questions concerning the Company's growth prospects and use of AI in the following pertinent exchange:

> [Q: Aleksandr J. Zukin – Wolfe Research, LLC – MD & Head of the Software Group] Henry, you talked about how you're seeing customers connect their AI solutions to the ZoomInfo platform. And I guess I'm just curious, how are you monetizing that connectivity, the broader engagement presumably that you're seeing as those things get kind of orchestrated and plugged in? And how much do you expect kind of that type of engagement or growth to be a tailwind over the next 12 months? And even maybe comment on kind of some -- how you're hearing the other horizontal app vendors approach this dynamic?
>
> [A: Defendant Schuck] Yeah. I mean I think, first, if we were just a software vendor, we wouldn't have this opportunity in front of us. I think when I was on a call last week with a large financial services firm, and they're building their own internal app where their financial team can go get answers and insights on any questions about businesses that they're prospecting into or wanting to learn from. And the first thing they asked us was, can we use your MCP server to plug into that? And they can. And so we're currently in the process of implementing our MCP server for them. That's a surface area we would never see before. We would enrich in CRM or we would -- or they would use our product in the traditional SaaS application.
>
> ***But now the surface area for where they want our data is expanding, and our technologies are plugging into those surface areas. Our guidance today looking forward through '26 doesn't take into consideration any tailwind from those new products or the expanding surface area where we see our data plugging into.*** That's a consumption-based model, very similar to our DaaS and operations business, where when our customers consume that data, they're charged a consumption fee.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

104. Also during the Q4 2025 Earnings Call, Defendant Schuck responded to an analyst's request for elaboration as to the Company's plans for increasing growth in the following pertinent exchange:

> [Q: Taylor Anne McGinnis – UBS Investment Bank – Equity Research Analyst] so Henry, when you think about 20% Copilot penetration and a lot of the good demand that you're seeing around the data side of the business. Just curious if there's any initiatives in 2026 to unlock the growth potential in those areas further.
>
> [A: Defendant Schuck] Yeah. I think first, one thing that I would add to Graham's commentary there is that there is more and more business from Copilot now in the customer base and in our ACV number, and we continue to see higher net retention rates from those customers who came on to Copilot versus our legacy non-AI solutions. ***So we think that will continue to be a tailwind for us. We are aggressively moving our customer base on to Copilot and GTM Workspace and getting them access to our new AI tools. Those we believe will continue to be positive tailwinds to our business as well.***

105. During the Q4 2025 Earnings Call, Defendant Schuck also responded to an analyst's questions concerning the evolution of the Company's consumption pricing model in the following pertinent exchange:

> [Q: Tyler Maverick Radke – Citigroup Inc. – VP & Senior Analyst] I wanted to just get your sense on how you expect this consumption pricing model to evolve? Like what are your aspirations for where this could be as a percentage of the business? And how do you think about this in terms of an accelerant to the overall growth profile?
>
> [A: Defendant Schuck] ***I think you see the beginnings of that with our operations business, is growing over 20% year-over-year, but it's happening in a much less programmatic way than what -- than the products that we're releasing today will provide for.*** And so a customer in our operations business may plug in our APIs for enrichment in a CRM or they may take a data file that they integrate with Snowflake, and that's a much more manual business motion for us than our new



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> products, which plug in seamlessly into Quad or OpenAI and allow them to take advantage in a much easier way of our data and our insights. ***And so we think consumption trends should follow very much what you see in operations.***

106. Also during the Q4 2025 Earnings Call, Defendant O'Brien responded to an analyst's question concerning the trajectory of the Company's "Copilot" product in the following pertinent exchange:

> [Q: Surinder Singh Thind – Jefferies LLC – Equity Analyst] Henry, can you maybe talk about just the current Copilot penetration? And I think you had set a 3-year target when it was launched to kind of substantially have all of your customers on the new product. Can you talk about actually where we are in that cycle and what that really means for where ACV is today and where it will ultimately get to?
>
> [A: Defendant O'Brien] ***We're at 20% penetration of the overall customer base. I'd say that we are on schedule, if not a little bit ahead of schedule relative to the migration plan that we rolled out back in Q2 of 2024. So we'll continue to migrate that core customer base to a Copilot experience over the next 2 years or so. And we're going to continue to be successful in getting uplift as we do that. A lot of our customers are on longer-term contracts. We have opportunities to move them off cycle, but a lot of them do end up waiting until they come up on a renewal event.*** And I'll point back to the migration is going well. Really pleased to see, though, that the renewal outcomes after actually being on Copilot for a year are better than what we saw from the legacy SalesOS. So that's where the kind of the real upside starts to kick in as we move more and more customers, both from a new business and an existing business perspective onto a Copilot experience.

***March 2, 2026 47th Annual Raymond James Institutional Investor Conference***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

107. On March 2, 2026, Defendant O'Brien represented the Company at the 47th Annual Raymond James Institutional Investor Conference (the "2026 Raymond James Conference").

108. During the 2026 Raymond James Conference, Defendant O'Brien responded to an analyst's request for elaboration as to the Company's position in the AI environment in the following pertinent exchange:

> [Q: Brian Christopher Peterson – Raymond James & Associates – Managing Director] And maybe just think about how ZoomInfo looks in kind of an AI world, I think it's a key debate in terms of like there's opportunities, but there's all risks. Like how could you frame that for us?
>
> [A: Defendant O'Brien] ***Yes, I see a lot of opportunity. It depends what your view is of kind of applications and seats in the future. But I think across almost all scenarios, we have a really great opportunity. And I think about this as a spectrum of how ZoomInfo helps customers go-to-market in an AI world***. You start with the data foundation and we kind of touched on that with the operations business. Then you've got the orchestration layer with Go-To-Market Studio. You can think of that as like a control tower that sits on top of ZoomInfo data that brings in your first-party data from CRM, from Snowflake, from other data silos, marries all that first and third-party data together and then helps you design intelligent campaign design, helps you enrich data at scale and then effectively push that out.
>
> [Q: Brian Christopher Peterson – Raymond James & Associates – Managing Director] And maybe just looking at AI from a budget perspective, are you finding that for some of your AI-enabled products that that's coming from an existing budget? Is that net new? Just curious how those conversations are going with customers.
>
> [A: Defendant O'Brien] ***It's a combination, but I would say that AI-specific budget is certainly kind of prioritized and is kind of better budget to go after.*** Historically, we're usually coming from a CRO budget where sales are off-budget. Occasionally, it's a CIO or a data budget. ***But we've had success kind of going and actually combining***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***budget at some of our customers and sometimes under kind of an ELA motion where we get stakeholders and leaders across different parts of the business to come together and align on the long-term investment with ZoomInfo.***
>
> [Q: Brian Christopher Peterson – Raymond James & Associates – Managing Director] Maybe opportunities to leverage AI. I know you're doing some of that today. But where do you think you could maybe expand that to drive further margin expansion going forward?
>
> [A: Defendant O'Brien] Yes. ***I mean, first and foremost, we're customer zero for our sales and marketing, AI products, right? So Copilot and Workspace, Go-To-Market Studio. We want to be best-in-class and to be the blueprint for our customers to show them how to leverage our own product set. And then outside of that, I think we've -- we're probably a little bit ahead of the curve in R&D when it comes to software development and productivity around that coding.*** And then G&A, I think there's like some legal finance HR use cases, where we've been able to automate and eliminate manual work and do it in a way that actually reduces risk.

109. Also during the 2026 Raymond James Conference, Defendant O'Brien responded to an analyst's questions concerning the Company's competitors in the following pertinent exchange:

> [Q: Unknown Attendee] So you mentioned you don't really see customers today deploying AI internally to build their own solutions. I'm curious. What do you see from AI-native start-up vendors? How do you think they compare to what you offer when you see them over ZoomInfo?
>
> [A: Defendant O'Brien] Yes. ***I think the AI development tools that are out there, stuff that we're using for our own developers like make application building easier. So I think if you are a -- or I guess, scenarios where AI native companies, like they might be building some of their own internal applications, whether that's for go-to-market use cases or not. There's always going to be some barrier about whether that makes sense for them to do it or just to go buy it from a trusted vendor.*** But I do think it further enhances and highlights



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> how valuable the context layer is because if you don't have the data and you don't have the context layer, whatever you're building on top of is not going to work.

***March 3, 2026 Morgan Stanley Technology, Media & Telecom Conference***

110. On March 3, 2026, Defendant O'Brien represented the Company at the Morgan Stanley Technology, Media & Telecom Conference (the "2026 Morgan Stanley Conference").

111. During the 2026 Morgan Stanley Conference, Defendant O'Brien responded to an analyst's request for elaboration of the Company's competitive environment in the following pertinent exchanges:

> [Q: Christopher Quintero – Morgan Stanley – Equity Analyst] Let's just jump right into AI. It's the hot topic. Clearly, a lot of investors think that software is a displacement risk from large language models, AI start-ups. So -- from your perspective, can you elaborate what you view as the core competitive moat for ZoomInfo?
>
> [A: Defendant O'Brien] Yes. I think AI is changing the way that people do their day-to-day work, and it's changing the way that software is built. ***Our competitive moat really stems from our proprietary data asset. You can think about that as largely coming from our contributory networks. We have 2 primary contributory networks. One is our customer contributory network where our customers will opt in to share business data with us. We're able to cleanse and enrich that data and refer to it back into our data asset.***
>
> [Q: Christopher Quintero – Morgan Stanley – Equity Analyst] So it's the data you guys have built from both the customer angle that contributes, but then also the larger community that also contribute and some of the data enrichment you do with some of these upstream partnerships. On the opportunity side, like why do you all think ZoomInfo is well positioned to bring AI capabilities to your customers?
>
> [A: Defendant O'Brien] Yes. ***I think that we see that we have the right to win to be the de facto go-to-market provider for essentially our --***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

***anyone who sells to other businesses. And whether that's essentially on the application end with the Copilot Workspace for orchestration use cases with the Go-To-Market Studio, which we're broadly bringing to market right now in Q1 or essentially as the GTM context layer with our operations business.*** Our operations business is our fastest-growing business at scale. It's over $200 million of ARR. It's not a seat-based model, essentially a consumption and data access model. And we essentially have this full spectrum of solutions where we can show up and be mission-critical to however companies want to go to market.

[Q: Christopher Quintero – Morgan Stanley – Equity Analyst] How are you guys thinking about the adoption? What are you seeing right now in terms of adoption from customers from these products? And any expectations like where that could be a year or 2 years from now?

[A: Defendant O'Brien] ***It's really going to be focused on what do the sequential consumption or engagement or usage trends look like.*** So the history of Studio is similar to Workspace as we were building it with customers, a set of early access customers in Q2 and Q3 last year. We kind of rolled it out to a select group of customers in Q4 on paid proof of concepts, and now we're more broadly taking it to market in Q1. ***So the way we're going to probably track this is looking at those consumption trends of those AI action credits as inventory data credits, cohort that and understand what those curves look like over time.***

[Q: Christopher Quintero – Morgan Stanley – Equity Analyst] NRR, that also improved meaningfully in 2025. Upmarket, that was above 100%. What drove that improvement? Was it the mix, the gross retention piece, the expansion? And ultimately, what are you embedding in terms of expansion rate for 2026 guidance?

[A: Defendant O'Brien] Yes. ***Our overall net revenue retention was 90% in 2025. The upmarket business in period, the last few quarters was back at or above 100%, and that was an improvement. So we were improving within the segment. We have better gross retention, and we had -- did a good job with the expansion opportunities as well.***

***Downmarket, retention got a little bit better as we started going***



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***through renewal cycles with customers that have been qualified at a more rigorous level.*** As we look forward, I don't -- I'm always hesitant to kind of call or rely on improvement downmarket. ***But I think the next step in our growth phase upmarket will be how do we bridge from 100% net retention right now to closer to 105%.*** I think that comes from stickier, deeper products and kind of the growth retention benefit that we get from that and then also bringing Go-To-Market Studio and Workspace and some of our consumption products to market here in 2026 and getting that expansion opportunity.
>
> [Q: Christopher Quintero – Morgan Stanley – Equity Analyst] How do you think about the ability to kind of invest for growth, protecting those margins? Is this kind of the kind of temporary margin profile we should kind of think about in longer term, back to kind of greater margin expansion?
>
> [A: Defendant O'Brien] Yes. ***I think we're on a path to continue to improve margins and 2025 was kind of the first step on that path. Our guidance for 2026 is almost a point better than 2025. And if you look at it kind of function by function in the financial statements, we've talked about cost of service maybe coming up some and driving gross margin down.***
>
> In R&D, we are already smaller than we were historically a few years ago. I'd characterize us as having kind of a smaller but more productive team. A lot of that's coming from reliance on AI coding tools and essentially more talent density. So I think R&D is effectively for fully loaded for the products that we are built or are building. There's no real incremental investment needed there.
>
> ***
>
> ***And then in G&A, I think we've been pretty forward on the curve of adopting AI to automate or eliminate manual tasks. I think we've done a good job of that in finance, in HR, in legal, in IT, and I continue to see opportunity to do that in '26 and beyond***.

112. The statements in ¶¶84-92, 94, 96, 98-100, 102-106, 108-109, and 111 above were materially false and misleading at the time they were made because they



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

failed to disclose, *inter alia*, that: (1) the market for AI expansion was contracting; (2) demand for the Company's products by software companies was declining; (3) increasing numbers of the Company's customers were pursuing their own internal AI systems as opposed to purchasing outside AI products; (4) as a result of the foregoing, the Company would be unable to meet its 2026 full year revenue guidance; and (5) as a result of the foregoing, the Company would have to eliminate 20% of its workforce and sustain roughly $45 million to $60 million in restructuring costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Fully Emerges**

***May 11, 2026 Press Release and Earnings Call***

113. The truth fully emerged on May 11, 2026, when the Company issued the Q1 2026 Press Release to announce its financial results for the first quarter of 2026. Notably, the Q1 2026 Press Release disclosed that the Company was reducing its revenue guidance, stating the following, in relevant part:

> **Business Outlook:**
>
> Based on information available as of May 11, 2026, ZoomInfo is providing guidance for the second quarter and full year 2026 as follows:

| | Q2 2026 | Prior FY 2026 | FY 2026 |
|---|---|---|---|
| GAAP Revenue | $300 - $303M | $1.247 - $1.267B | $1.185 - $1.205B |

114. That same day, the Company hosted the Q1 2026 Earnings Call to discuss the Company's financial results for the first quarter of 2026 with investors and analysts.

115. During the Q1 2026 Earnings Call, Defendants Schuck and O'Brien reported that ZoomInfo would be firing 20% of its workers and would sustain



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

roughly $45 million to $60 million in costs associated with restructuring its business. Defendant Schuck stated the following during the Q1 2026 Earnings Call, in relevant part:

> While we exceeded our guidance in Q1, as macro conditions worsened at the end of the quarter, ***we experienced a regression in our downmarket and upmarket growth trajectories. In the closing days of March and into April, we saw a trend of AI and agentic confusion in our customer conversations***. What can be built versus bought, what vendor or internal team delivers what and where the differentiation really lives. ***This led to a pause in purchasing decisions and our software customers were particularly affected as many are facing a confusing purchasing landscape compounded by the threat of their own growth disruption, creating a circular headwind in our space***.
>
> ***As a result, we are revising our full year guidance down in conjunction with significant cost reductions that we believe will position us with structurally higher operating margins and create a faster path back to durable growth. This was hard because of the impact on a large number of our teammates, many with long tenures here who did good work to get us to this point. Change is necessary and a positive decision for the future of ZoomInfo***.

116. Also during the Q1 2026 Earnings Call, Defendant O'Brien discussed the reduction in the Company's full year 2026 revenue guidance, stating the following in relevant part:

> As we moved through March, we saw more customer confusion in the marketplace around what AI can and cannot do and increased macroeconomic uncertainty.
>
> ***With the improving trends we have seen in 2025 starting to moderate, it became clear that our growth progression was no longer on schedule and that now is the right moment to be proactive and accelerate the time line of our strategic initiatives***. We believe we can further rightsize the downmarket business, shift to a better suited pricing model for our customers while reducing the potential overhang



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> from further seat compression as we consolidate global operations while largely protecting profitability in the process, despite the near-term revenue impact, we can return to healthier growth levels sooner than a status quo approach would deliver.
>
> ***As a result, we are now guiding to FY 2026 revenue in the range of $1.185 billion to $1.205 billion. This is a proactive improvement measure in a period of significant transition. While our initial guidance for the year did not embed upside from new product initiatives, it also did not anticipate the environment getting worse.*** Our updated guidance adds some incremental top line conservatism to account for a fluctuating macroeconomic environment as well as the potential for near-term headwinds as we execute against our strategic initiatives.

117. Later on during the Q1 2026 Earnings Call, the Defendant Schuck responded to an analyst's question pertaining to disruption in the AI environment, in the following relevant exchange:

> [Q: Mark Ronald Murphy – JPMorgan Chase & Co. – Managing Director & Head of U.S. Enterprise Software Research] So it's a very software-centric kind of situation, it sounds like. I'm curious as well just how much of the AI confusion you're seeing would you relate to the takeoff of Claude Code during the month of March, I think that's when you saw a bit of a shift. And that seemed to be the period of lift off for Claude Code. And just as a corollary, any thought on how long that period of AI confusion might last?
>
> [A: Defendant Schuck] [Yes. ***I think***] ***the big shift here is even in our most sophisticated software clients, what we're seeing them shift away from is a seat license in ZoomInfo and shift to significantly more consumption of our data inside of Claude with our MCPs through our APIs. We have a number of examples of AI native companies who have shifted from seats but are spending meaningfully more with us through consumption of our data in their internal applications that they've built through our MCPs, through our APIs, through bulk credit consumption.***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> [And so] we have a lot of confidence that there's this moment where companies are confused about what they actually need to be able to build their own internal applications to build their own revenue workflows, where the most sophisticated AI native companies are leveraging our data throughout that entire workflow and then companies that are doing sort of quick AI projects have not made that realization yet. ***And so we are positioning the company from a pricing and packaging perspective to take advantage of that situation. So that when we talk to a customer who tells us, I don't need seats anymore because I've built my own application that we can be really flexible and say, look, your own application is going to need contact information.*** It's going to need company information. It's going to need hierarchy information. It's going to need signal information, and we can be really flexible on your transition over to that as you build your own internal application.

118. Also during the Q1 2026 Earnings Call, Defendant Schuck responded to an analyst's question concerning the Company's prospects for expansion in light of headwinds noted in the software industry and AI environment in the following exchange:

> [Q: Aleksandr J. Zukin – Wolfe Research, LLC – MD & Head of the Software Group] And then maybe to the -- Henry, to the point that you made earlier about some of your motions, particularly kind of unleashing the data asset. It was particularly striking that at the same time as you're calling out kind of some headwinds in broader software and AI anxiety, 2 of your most iconic wins, I think that you cited in the quarter were with Sierra and another AI Unicorn. So maybe can you just help us understand how -- I assume those 2 companies aren't massively expanding seat count. So how are those 2 iconic wins specifically leveraging some of that kind of leading edge functionality that you're talking about? And what do those either expands or lands look like relative to previous cohorts?

> [A: Defendant Schuck] Yes. ***I think the big difference that we're seeing is customers -- those AI native customers are building their own internal revenue workflows. In software, you have a very opinionated interface that you provide your customers. And it's***



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

> ***opinionated because you have product managers who deeply understand the domain and they try to build a flexible enough interface or a generic interface that customers across a broad spectrum of types and revenue workflows can get value out of.***
>
> The AI natives are building their own revenue workflows. They're building their own interfaces. They're bringing in their own first-party data. They're building in their own unique workflows. Every company's go-to-market workflow is a little bit different than the next companies. But every company's go-to-market workflow requires data on companies, requires data on contact, requires hierarchy and subsidiary mapping so that you could do territory segmentation and planning. And so these companies are coming in and they're saying, we have a revenue workflow, we've built it. ***We've built a prospecting workflow, but we need data to plug into that. And so these deals are much heavier on the data consumption side and much lighter on the seats.***

119. Later on during the Q1 2026 Earnings Call, Defendant Schuck responded to an analyst's question concerning recent trends in the software industry in the following pertinent exchange:

> [Q: Raimo Lenschow – Barclays Bank PLC – MD & Analyst] What you're seeing at the moment in software, is that the software companies are reducing their sales capacity? Or is it that they are actively building the front end like the AI guys are doing?
>
> [A: Defendant Schuck] ***I think it's a little bit of both. But I think at this point, we are happy to see it spill over into other industries because we think the bigger upside opportunity here is consumption of our data where every go-to-market workflow runs.*** And so yes, we see it in software today, and we're leaning in to capture that opportunity with much more flexible pricing and the ability to transfer seat prices into consumption of our data.
>
> [Q: Raimo Lenschow – Barclays Bank PLC – MD & Analyst] Yes, it makes total sense. I mean you always have a very strong data set from the very beginning since we first met you. And Graham, then if you think about guidance, like how much is that -- is the guidance implying



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

that software is moving versus other guys are moving? Is that -- do you think about this in stages like this year is more software and it's part of the guidance and then next year something else? Or like are you going to -- like this year, the whole model gets flipped to consumption anyway. And so whatever other industries are doing, it doesn't matter then?

[A: Defendant O'Brien] Yes. I don't think it's -- I think there's a certainly a vertical-specific assumption around software. But look, we still see good performance in our upmarket business and our operations business. And the revision to revenue and the cost out is focused on our downmarket business where our margin profile is the worst. ***The development of uncertainty on multiple fronts is the primary reason behind the guidance revision, and we want to minimize the risk of another negative revision.***

120. On this news, the price per share of the Company's common stock fell $1.98, or roughly 32.8%, from a price per share of $6.04 at the close of trading on May 11, 2026 to close at $4.06 on May 12, 2026.

## REPURCHASES DURING THE RELEVANT PERIOD

121. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $160.2 million to repurchase approximately 21.7 million shares of its own common stock at artificially inflated prices from November 2025 through May 2026.

122. According to the Annual Report on Form 10-K the Company filed with the SEC on February 12, 2026 (the "2025 10-K"), between November 1, 2025 and November 30, 2025, the Company repurchased 500,527 shares of its own common stock at an average price per share of approximately $9.98, for a total cost to the Company of approximately $4,995,259.[2]

---

[2] Upon information and belief, the Company repurchased the 500,527 shares noted (footnote continued)



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

123. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $2,963,120 for repurchases of its own stock between November 1, 2025 and November 30, 2025.

124. According to the 2025 10-K, between December 1, 2025 and December 31, 2025, the Company repurchased 4,313,059 shares of its own common stock at an average price per share of approximately $10.08, for a total cost to the Company of approximately $43,475,635.

125. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $25,964,615 for repurchases of its own stock between December 1, 2025 and December 31, 2025.

126. According to the Quarterly Report on Form 10-Q the Company filed with the SEC on May 11, 2026 (the "Q1 2026 10-Q"), between January 1, 2026 and January 31, 2026, the Company repurchased 2,713,866 shares of its own common stock at an average price per share of approximately $9.45, for a total cost to the Company of approximately $25,646,034.

127. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $14,627,738 for repurchases of its own stock between January 1, 2026 and January 31, 2026.

128. According to the Q1 2026 10-Q, between February 1, 2026 and February 28, 2026, the Company repurchased 5,794,555 shares of its own common stock at an average price per share of approximately $6.36, for a total cost to the Company of approximately $36,853,370.

129. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $13,327,477 for repurchases of its own stock between February 1, 2026 and February 28, 2026.

---

above during the Relevant Period.



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

130. According to the Q1 2026 10-Q, between March 1, 2026 and March 31, 2026, the Company repurchased 4,591,978 shares of its own common stock at an average price per share of approximately $6.09, for a total cost to the Company of approximately $27,965,146.

131. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $9,321,715 for repurchases of its own stock between March 1, 2026 and March 31, 2026.

132. According to the Quarterly Report on Form 10-Q the Company filed with the SEC on August 5, 2026 (the "Q2 2026 10-Q"), between April 1, 2026 and April 30, 2026, the Company repurchased 3,164,926 shares of its own common stock at an average price per share of approximately $5.89, for a total cost to the Company of approximately $18,641,414.

133. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $5,791,815 for repurchases of its own stock between April 1, 2026 and April 30, 2026.

134. According to the Q2 2026 10-Q, between May 1, 2026 and May 31, 2026, the Company repurchased 597,549 shares of its own common stock at an average price per share of approximately $4.39, for a total cost to the Company of approximately $2,623,240.[3]

135. As the Company's stock was actually worth only $4.06, the price at closing on May 12, 2026, the Company overpaid by approximately $197,191 for repurchases of its own stock between May 1, 2026 and May 31, 2026.

136. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***approximately $72.2 million***.

---

[3] Upon information and belief, the Company repurchased the 597,549 shares noted above during the Relevant Period.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

**DAMAGES TO ZOOMINFO**

137. As a direct and proximate result of the Individual Defendants' conduct, ZoomInfo will lose and expend many millions of dollars.

138. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

141. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

142. Such losses include the Company's overpayment of approximately $72.2 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

143. As a direct and proximate result of the Individual Defendants' conduct, ZoomInfo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

144. Plaintiff brings this action derivatively and for the benefit of ZoomInfo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of ZoomInfo, violations of the Exchange Act, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

145. ZoomInfo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146. Plaintiff is, and has been at all relevant times, a shareholder of ZoomInfo. Plaintiff will adequately and fairly represent the interests of ZoomInfo in enforcing and prosecuting his rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

147. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

148. A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Schuck, Enright, Evans, Giglio, Gleeson, Mader, Maida, Rooney, Winn, and Wurzbacher (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants who are on the Board at the time this action is commenced.

149. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

cause the Company to make false and misleading statements and omissions of material facts, and, at the same time, to cause the Company to overpay by approximately $72.2 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

150. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted ZoomInfo to issue materially false and misleading statements. Specifically, the Director-Defendants caused ZoomInfo to issue false and misleading statements which were intended to make ZoomInfo appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

151. Additional reasons that demand on Defendant Schuck is futile follow. Defendant Schuck has served as the CEO and Chairman of the Board of the Company since co-founding the Company in November 2019. The Company provides Defendant Schuck with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the trusted CEO, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action. For



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

these reasons, too, Defendant Schuck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152. Additional reasons that demand on Defendant Enright is futile follow. Defendant Enright has served as a Company director since March 2020. Defendant Enright currently serves as the Chair of the Privacy, Security and Technology Committee and as a member of the Audit Committee. Defendant Enright received and continues to receive handsome compensation for his role as a Company director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Enright breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Evans is futile follow. Defendant Evans has served as a Company director since February 2020. Defendant Evans currently serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Evans received and continues to receive handsome compensation for her role as a Company director. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Evans breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

154. Additional reasons that demand on Defendant Giglio is futile follow. Defendant Giglio has served as a Company director since March 2025. Defendant Giglio currently serves as a member of the Nominating and Corporate Governance Committee. Defendant Giglio has received and continues to receive handsome compensation for his role as a Company director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Giglio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155. Additional reasons that demand on Defendant Gleeson is futile follow. Defendant Gleeson has served as a Company director since July 2022. Defendant Gleeson currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Gleeson received and continues to receive handsome compensation for her role as a Company director. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Gleeson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156. Additional reasons that demand on Defendant Mader is futile follow. Defendant Mader has served as a Company director since February 2020. Defendant Mader also serves as a member of the Audit Committee. Defendant Mader received



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

and continues to receive handsome compensation for his role as a Company director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mader breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157. Additional reasons that demand on Defendant Maida is futile follow. Defendant Maida has served as a Company director since August 2024. Defendant Maida currently serves as a member of the Privacy, Security, and Technology Committee. Defendant Maida received and continues to receive handsome compensation for his role as a Company director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Maida breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Rooney is futile follow. Defendant Rooney has served as a Company director since February 2025. Defendant Rooney currently serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Rooney received and continues to receive handsome compensation for her role as a Company director. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Rooney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159. Additional reasons that demand on Defendant Winn is futile follow. Defendant Winn has served as a Company director since February 2020. Defendant Winn currently serves as a member of the Compensation Committee and as a member of the Privacy, Security and Technology Committee. Defendant Winn received and continues to receive handsome compensation for his role as a Company director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Winn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand on Defendant Wurzbacher is futile follow. Defendant Wurzbacher has served as a Company director since August 2024, and as the Company's lead independent director since February 2026. Defendant Wurzbacher currently serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Wurzbacher received and continues to receive handsome compensation for his role as a Company director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wurzbacher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161. Additional reasons that demand on the Board is futile follow.

162. Defendants Rooney (as current Chair), Enright, Evans, and Mader (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

163. All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

164. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

165. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

166. ZoomInfo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for ZoomInfo any part of the damages ZoomInfo suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

167. The acts complained of herein constitute violations of fiduciary duties owed by ZoomInfo's officers and directors, and these acts are incapable of ratification.

168. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the shareholders of ZoomInfo. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of ZoomInfo, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

169. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause ZoomInfo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

170. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

**FIRST CLAIM**

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

171. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding ZoomInfo. Not only is ZoomInfo now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon ZoomInfo by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares on the open market at artificially inflated prices, damaging ZoomInfo.

173. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

174. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about ZoomInfo not misleading.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

175. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by ZoomInfo.

176. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

177. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executives and/or directors of the Company, as members of the Board, the Individual Defendants then serving as directors signed the Company's false and misleading statements filed with the SEC during the Relevant Period.

178. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

180. Plaintiff incorporates by reference and re-alleges each and every



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

allegation set forth above, as though fully set forth herein.

181. The Individual Defendants, by virtue of their positions with ZoomInfo and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ZoomInfo within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause the Defendants to engage in the illegal conduct and practices complained of herein.

182. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

183. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ZoomInfo's business and affairs.

185. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

186. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ZoomInfo.

187. In breach of their fiduciary duties owed to ZoomInfo, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the market for AI expansion was contracting; (2) demand for the Company's products by software companies was declining; (3) increasing numbers of the Company's customers were pursuing their own internal AI systems as opposed to purchasing outside AI products; (4) as a result of the foregoing, the Company



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

would be unable to meet its 2026 full year revenue guidance; and (5) as a result of the foregoing, the Company would have to eliminate 20% of its workforce and sustain roughly $45 million to $60 million in restructuring costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

188. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

189. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

190. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

191. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ZoomInfo's securities and disguising insider sales.

192. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

193. As a direct and proximate result of the Individual Defendants' breaches



THE BROWN LAW FIRM, P.C.
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

of their fiduciary obligations, ZoomInfo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

194. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants for Unjust Enrichment**

195. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ZoomInfo.

197. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from ZoomInfo that was tied to the performance or artificially inflated valuation of ZoomInfo, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

198. Plaintiff, as a shareholder and representative of ZoomInfo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

199. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

**<u>FIFTH CLAIM</u>**

**Against Individual Defendants for Abuse of Control**

200. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

201. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ZoomInfo, for which they are legally responsible.

202. As a direct and proximate result of the Individual Defendants' abuse of control, ZoomInfo has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

203. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

**<u>SIXTH CLAIM</u>**

**Against Individual Defendants for Gross Mismanagement**

204. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ZoomInfo in a manner consistent with the operations of a publicly-held corporation.

206. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ZoomInfo has sustained and will continue to sustain significant damages.

207. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

208. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

**SEVENTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

209. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

211. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused ZoomInfo to waste valuable corporate assets while ZoomInfo suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations and the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

212. In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

213. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

214. Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

**EIGHTH CLAIM**

**Against Defendants Schuck and O'Brien for Contribution Under Sections 10(b) and 21D of the Exchange Act**

215. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. ZoomInfo and Defendants Schuck and O'Brien are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schuck's and O'Brien's willful and/or reckless violations of their obligations as officers and/or directors of ZoomInfo.

217. Defendants Schuck and O'Brien, because of their positions of control and authority as officers and/or directors of ZoomInfo, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of ZoomInfo, including the wrongful acts complained of herein and in the Securities Class Action.

218. Accordingly, Defendants Schuck and O'Brien are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

219. As such, ZoomInfo is entitled to receive all appropriate contribution or indemnification from Defendants Schuck and O'Brien.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of ZoomInfo, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ZoomInfo;

(c) Determining and awarding to ZoomInfo the damages sustained by it as a result of the violations set forth above from each of the Individual



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing ZoomInfo and the Individual Defendants to take all necessary actions to reform and improve ZoomInfo's corporate governance and internal procedures to comply with applicable laws and to protect ZoomInfo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of ZoomInfo to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding ZoomInfo restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.



**THE BROWN LAW FIRM, P.C.**
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
(516) 922-5427

Dated: August 20, 2026

Respectfully submitted,

**YANICK LAW & DISPUTE RESOLUTION PLLC**

By: */s/ Miles A. Yanick*
Miles A. Yanick, WSBA #26603
1325 Fourth Avenue, Suite 1130
Seattle, WA 98101
Telephone: 206-455-5924
Email: myanick@yanicklaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

**VERIFICATION**

I, Nick Harley, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of August, 2026.

DocuSigned by:

6709174DC1214CA...

Nick Harley